## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CHEVELLE BUSH, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 23-cv-783-RJD** |
| | ) | |
| PERCY MYERS, M.D., et al., | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## ORDER

**DALY, Magistrate Judge:**

Plaintiff, an inmate of the Illinois Department of Corrections (IDOC), filed this suit pursuant to 42 U.S.C. §1983 (Docs. 1, 47).  Plaintiff alleges that Dr. Myers was deliberately indifferent to his serious medical needs at Pinckneyville Correctional Center ("Pinckneyville") and also retaliated against him (Docs. 1, 8).  Plaintiff's Complaint also claims that his Eighth Amendment rights were violated by Wexford Health Sources, Inc. ("Wexford"), a company that contracts with IDOC to provide medical treatment of IDOC inmates (Doc. 47).   The warden at Pinckneyville, Defendant Mitchell, is a defendant for purposes of carrying out injunctive relief.

This matter comes before the Court on the Motion for Preliminary Injunction (Doc. 6) filed by Plaintiff.  Defendants responded (Docs. 24 and 27).  The Court held a hearing on May 11, 2023.  As explained further, Plaintiff's Motion is DENIED.

### Background

In his Complaint, Plaintiff alleges that he severely tore his right triceps at Stateville Correctional Center on April 14 2022.  Doc. 1, p. 40.   Plaintiff's right leg had been amputated

in 2019, so the right triceps injury severely limited his mobility and caused him considerable pain. *Id*., p. 41.   On April 19, 2022, Plaintiff transferred to Pinckneyville.   *Id*., p. 40.   Upon arrival, he informed the health care unit of the injury.   *Id*.   On April 26, 2022, Plaintiff's right arm became swollen and he received treatment at an outside hospital's emergency room.   *Id*., p. 41. According to Plaintiff, the emergency room doctor misdiagnosed his condition as bursitis.   *Id*. The doctor also told Plaintiff he needed an MRI.   *Id*.

Plaintiff repeatedly told healthcare staff at Pinckneyville that he needed an MRI.   *Id*.   In May 2022, Dr. Myers agreed to order an MRI, but then he changed his mind and ordered an ultrasound.   *Id*., p. 42.   Plaintiff was told that the results were normal.   *Id*., p. 43.   Plaintiff started filing grievances regarding his lack of treatment, and then prison officials began to retaliate against him.   *Id*., p. 42.   He stopped receiving pain medication and his blood pressure medication.   *Id*.   Dr. Myers either directed the retaliation or knew about it.   *Id*.

On November 11, 2022, Plaintiff underwent an MRI.   *Id*., p. 43.   The results showed that he had nerve damage.   *Id*.   He continues to have significant pain, numbness, and swelling in his right arm.   *Id*.   His right hand will become very hot, while his left hand becomes very cold.   *Id*.

Plaintiff filed suit on March 3, 2023.   He alleges that Wexford has a practice of condoning delays for urgent treatment to save money and that Wexford physicians like Dr. Myers are encouraged to spend minimal time with patients.   The Court conducted a threshold review of Plaintiff's Complaint pursuant to 28 U.S.C. §1915A and Plaintiffs case proceeded on the following claims.

Count 1:     Eight Amendment claim against Dr. Myers and Wexford for deliberate indifference to Plaintiff's right arm injury and pain.

Count 2:     First Amendment retaliation claim against Dr. Myers.

Plaintiff filed the Motion for Preliminary injunction on March 3, 2023.

**Medical Records**

Plaintiff's medical records indicate that after his fall at Stateville Correctional Center on April 14, 2022, he was sent to an outside hospital and underwent x-rays of his right shoulder, arm and hand, as well as a CT scan of the cervical spine and head.   Doc. 24-2, p. 43-46.   The x-rays indicated "no acute osseous abnormality" and "if persistent symptoms, recommend short-term radiographic follow-up."   Id., p. 43.

Approximately two weeks later, Plaintiff (recently transferred to Pinckneyville), appeared at the Pinckneyville Community Hospital.  *Id*., p. 49.   The ER physician noted that he had swelling and elbow pain, and that his "right olecranon bursa appears to be filled with fluid."[1]  *Id.,* p. 50.   An x-ray of his elbow revealed "no acute osseous abnormality."   *Id.,* p. 51.   Plaintiff underwent an arthrocentesis "to aid in determining a diagnosis."[2]  *Id.,* p. 52.   However, the doctor could not obtain enough fluid to send for diagnostic studies.   *Id.*

Defendant Dr. Myers referred Plaintiff for a right upper arm ultrasound on or around June 24, 2022.  *Id.,* p. 128.   The ultrasound was performed on September 9, 2022 and the impression was "no discrete ultrasound abnormality in relation to the area in question.    If symptoms persist consider MRI for further characterization."   *Id.,* p. 129.    On October 6, 2022, Wexford's "Utilization Management" approved an MRI of Plaintiff's right shoulder. *Id.,* p. 132.   Plaintiff underwent the MRI on November 11, 2022.   The impression read as follows:

> Intramuscular edema throughout the shoulder girdle musculature with most pronounced in diffuse edema throughout the visualized portions of the triceps.   This could represent strain/contusion

---

[1] The olecranon bursa is "the fluid-filled sace that protects and cushions your eblow joint." myclevelandclinic.org/health/diseases/22553-elbow-olecranon-bursitits (last visited May 11, 2023).
[2] An "arthrocentesis removes fluid from swollen joints.   It can diagnose and treat the cause of joint pain." myclevelandclinic.org/health/treatments/14512-arthrocentesis-joint-aspiration (last visited May 11, 2023).

> though sequela of denervation is a consideration.   Correlate for
> signs of a process such as brachial plexitis/plexopathy and consider
> correlation with nerve conduction studies/myelography as clinically
> warranted.

*Id.,* p. 208.   Plaintiff then saw a Physician Assistant ("PA") at the Orthopaedic Institute of

Southern Illinois on December 30, 2022.   *Id.,* p. 217.   The PA assessed Plaintiff as having "likely

brachial plexopathy resulting in some triceps weakness and atrophy with an underlying partial-

thickness rotator cuff tear that appears to be minimally symptomatic at this point."   *Id.,* p. 220.

The PA recommended "EMG/nerve conduction study of the right upper extremity.   We will

review those results once available.   Discussed likely referral to neurologist.   We will give an

order for therapy to begin working on strengthening….if he has any persistent complaints with

shoulder pain focally, then we will be happy to see him back to give him subacromial injection."

*Id.*

Wexford's Utilization Management approved the EMG/nerve conduction study on January

4, 2023.   *Id.,* p. 223.   Plaintiff started physical therapy at Pinckneyville on January 12, 2023.   *Id.,*

p. 221.   Over the next two months,   Plaintiff participated in physical therapy on approximately

14 occasions.   *Id.,*   p. 228-245.

### Evidentiary Hearing

Plaintiff testified that he "was just starting to get used to walking with [his prosthetic] leg"

and using a walker when he fell and injured his arm.   Because of his arm injury, he now uses a

wheelchair.   He can only move the wheelchair for a "little bit" on his own before his arm "goes

numb."   Plaintiff uses his left foot to guide the wheelchair, or he finds someone to push it for him.

Plaintiff cannot adequately use his arm to clean himself after having a bowel movement.   He also

has difficulty getting out of bed.    Plaintiff has a position at the prison in culinary arts, but he

cannot stir food.   Plaintiff is no longer receiving physical therapy.   The physical therapist taught

him exercises that he performs on his own time.

Plaintiff further testified that Dr. Myers has never physically examined his arm.  Dr. Myers prescribed two types of depression medication to Plaintiff, telling Plaintiff that the depression medication also helps pain control.  Plaintiff told Dr. Myers that the depression medication makes him feel "delirious and dizzy."  Dr. Myers also gives him Tylenol and Naproxyn, which Plaintiff says are "killing" his kidneys."   Plaintiff is currently taking blood pressure medication.

Dr. Myers testified that Plaintiff's MRI results indicate that he has either a strain or brachial plexopathy.  "Plexitis" or "plexopathy" describes an injury to the bundle of nerves that exit the cervical spine and travels down the arm; that bundle "pretty much" controls sensation in that arm. There are varying degrees of severity to this condition.   The nerves could be completely severed from the spine (most severe) or just stretched (least severe).  For patients who have merely stretched nerves, physical therapy may alleviate their symptoms.

Plaintiff is scheduled to undergo a nerve conduction study in July 2023.   The purpose of the nerve conduction study is to determine how viable Plaintiff's nerves are, i.e., how well they are functioning.   The results of Plaintiff's nerve conduction study will dictate the next steps in his treatment.   Plaintiff was discharged from physical therapy by the physical therapist on April 13, 2023.

Dr. Myers prescribed both Cymbalta and Pamelor to Plaintiff.   Dr. Myers prescribes these medicines to patients with chronic pain because they are effective, non-narcotic pain medications.   He tells patients that these medicines have a dual purpose: 1) depression treatment; and 2) pain control.   He also tells patients that it takes three to four weeks to "notice a difference." In the meantime, he recommends that patients take Tylenol or Naproxyn.

Dr. Myers testified that there are other methods to approach pain management.   For example,   if Plaintiff returned to see him and described continuing arm pain, Dr. Myers would consider a "pain patch" or topical cream.   He would also consider the subacromial injection mentioned in Plaintiff's records from the Orthopaedic Institution.   However, the last time Plaintiff saw Dr. Myers was in February.   Dr. Myers testified that Plaintiff did not mention arm pain during that visit.   Plaintiff disagreed, testifying that he told Dr. Myers he was in pain on that date, and that he has been in the healthcare unit on other occasions since them complaining of arm pain.

## Legal Standard

The Prison Litigation Reform Act ("PLRA") mandates that any preliminary injunctive relief ordered in this case must be "narrowly drawn, extend no further than necessary to correct the harm…," and "be the least intrusive means necessary to correct that harm."   18 U.S.C. §3626 (a)(2).   To obtain a preliminary injunction,   Plaintiff must establish that (1) he will suffer irreparable harm without the injunction; (2) "traditional legal remedies are inadequate"; and (3) he has "some likelihood of succeeding on the merits."   *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020).   An injunction that requires an affirmative act by the respondent is a mandatory preliminary injunction and should be "sparingly issued."   *Id*., (*citing Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1998)).

## Discussion

Here, Plaintiff has not shown that he will suffer irreparable harm without a preliminary injunction.   It appears that Plaintiff has another option: he may return to the healthcare unit to report his ongoing pain and discuss options for pain management with Dr. Myers.     Dr. Myers has not seen Plaintiff since February 2023.   At that visit, Dr. Myers saw Plaintiff for an unrelated condition.   Plaintiff was receiving physical therapy for his arm pain and within the last two

months, had seen an orthopedic specialist.   Since then, Plaintiff has completed physical therapy and is now scheduled for a nerve conduction study to determine the extent of his injury.

Plaintiff contends that he has sufficiently made healthcare providers at Pinckneyville aware that he continues to have arm pain.   The Court disagrees.   Dr. Myers testified that for some patients, brachial plexopathy is alleviated by physical therapy.   Plaintiff has not returned to see Dr. Myers since he was discharged from physical therapy.    Dr. Myers further testified that there are alternative pain management options that may be ordered for Plaintiff, but Plaintiff must return to the healthcare unit specifically to discuss his ongoing arm pain with Dr. Myers.   Because Plaintiff has not taken that action, the undersigned is not willing to take the drastic step of ordering prison officials and medical personnel to provide specific medical treatment to Plaintiff.

The relief that Plaintiff is requesting-a mandatory preliminary injunction under the PLRA-should only be "sparingly issued" and "narrowly drawn."    The record reflects that Plaintiff may (*without* Court intervention) return to see Dr. Myers to discuss additional treatment options for his pain.   Dr. Myers' testimony reflects that he is willing to discuss these options with Plaintiff, and simply has not yet had the opportunity to discuss Plaintiff's symptoms that remain after his discharge from therapy.   Moreover, the healthcare staff continues to arrange to send Plaintiff off-site for further diagnostic testing to determine-without court intervention.   Because Plaintiff has not established that he will suffer irreparable harm without an injunction, it is not necessary to analyze the additional requirements for injunctive relief.   Plaintiff's Motion for Preliminary Injunction (Doc. 6) is DENIED.

**IT IS SO ORDERED.**

**DATED: June 16, 2023**

s/ *Reona J. Daly*

**Hon. Reona J. Daly**
**United States Magistrate Judge**